UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| CONSTANCE ROMANETTO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:20-CV-61 PLC |
| | ) |
| KILOLO KIJAKAZI,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Constance Romanetto seeks review of the decision of Defendant Acting Social Security Commissioner Kilolo Kijakazi denying her application for Supplemental Security Income (SSI) under the Social Security Act. For the reasons set forth below, the Court affirms the Commissioner's decision.

**I.     Background**

In November 2017, Plaintiff, who was born April 1972, filed an application for SSI alleging that she was disabled as of March 25, 2010[2] as a result of: "emphysema, asthma, chronic obstructive pulmonary disease, hole in heart, irregular heartbeat, scoliosis, endometriosis, irritable bowel syndrome, narcolepsy, insomnia, seizures, post-traumatic stress disorder, split personality, pinched nerve in right hip, lower back pain."  (Tr. 84-85, 187-92)   The Social Security

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Plaintiff later amended the alleged onset date of disability to November 14, 2017.  (Tr. 206)

Administration (SSA) denied Plaintiff's claim, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 103-07, 110-12)  In August 2019, an ALJ conducted a hearing at which Plaintiff and a vocational expert testified. (Tr. 52-83)

In a decision dated February 7, 2020, the ALJ determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, since October 31, 2017, the date the application was filed." (Tr. 13-28)  Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-5, 181-84)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.     Evidence Before the ALJ

Plaintiff testified that she had an eleventh-grade education and driver's license, and she lived with her husband. (Tr. 62-63)  Plaintiff and her husband stayed with relatives because they did not "really have a home." (Tr. 63)

Plaintiff stated that she had not worked since she was raped in 2010. (Tr. 64)  Since that time, Plaintiff "pretty much stay[ed] like a turtle, scared to go anywhere. (Tr. 63-64).  Plaintiff added, "I'm scared to leave the home.  With me having IBS I never know when it's going to hit.  Either my bowel releases or my bladder, so I'm really scared to go anywhere."[3]  (Tr. 64)  Plaintiff estimated that she experienced four or five "accidents" per week. (Tr. 76)  Additionally, Plaintiff complained of acid reflux, scoliosis, "two bad knees," and a hiatal hernia. (Tr. 69, 76)

Plaintiff also suffered "severe anxiety and depression," PTSD, and "psychiatric non-epileptic seizures." (Tr. 67)  Plaintiff explained: "I was abused by my father for many years, hit

---

[3] Plaintiff later elaborated: "I can't stay out of the bathroom.  I go to the bathroom more than anybody else.  I can go to the bathroom about eight times a day and it just – I have no control of it." (Tr. 76).

2

in the head multiple times, taken advantage of, tortured.  I have flashbacks.  I have a hard time sleeping because of it…. I have nightmares."[4]  (Tr. 69)  When "little things trigger[ed]" Plaintiff's flashbacks, she would "to [her] room.  And I'm like a little turtle, I tuck my head into my shell and I'm scared to get out."  (Tr. 71)  Plaintiff described difficulty in public, stating, "if I go to the store I get anxiety so bad when I'm around a bunch of people because I feel like they're sitting there staring at me and looking through my soul…. I get panicky and ask my husband please get me out of here."  (Tr. 72-73)

Plaintiff experienced crying spells and difficulty concentrating.  She explained, "[r]eading a book, reading my Bible, or having a conversation with family members I lose track on what I'm even talking about."  (Tr. 73)  Plaintiff estimated that she experienced two or three panic attacks per day, during which "I start crying.  I get nervous.  I go to my room and find my blanket and my dog and lay down."  (Tr. 75)  Plaintiff stated that these episodes generally lasted one to two hours.  (Id.)

She received mental health treatment from psychiatrist Dr. Ulrich, and she was going to begin therapy the following day.  (Tr. 70-71)  Plaintiff testified that Dr. Ulrich had "tried different medications," and she was currently taking Cymbalta, Buspar, Klonopin, and "medicine that helps

---

[4] Plaintiff described flashbacks of her traumatic childhood:
> …I have flashbacks of what my dad did to me, what he did to my mama, cleaning, finding my uncle dead, being locked up in a closet for seven days as a child, living with my grandparents because my dad would threaten to kill me.
>
> I've got scars where I've been burned.  I've been hit in the head so many times my memory just isn't there.  I have a hard time concentrating.  I have a hard time getting my words out.  Sometimes I feel like an idiot because what he put me through that I have a hard time communicating, trusting people because I'm scared it's going to happen against because not only did my dad rape me, but he let other people take advantage of me.

(Tr.71-72)

block nightmares…." (Tr. 74-75)  Plaintiff did not experience side effects from her medications. (Tr. 76)  Plaintiff had not "used any drugs or alcohol" since 2003.  (Tr. 68)

A vocational expert also testified at the hearing.  (Tr. 79-82)  The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work experience who was able to perform light work with the following additional limitations:

> The hypothetical individual can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl. The hypothetical individual should avoid extreme cold, extreme heat, humidity, loud noise which would be SCO Noise Intensity Level 4 and above; avoid vibration, and can have occasional exposure to concentrated fumes, odors, dusts, gases, and poor ventilation.  The hypothetical individual should avoid hazards such as unprotected heights and moving mechanical parts; and is able to complete simple routine tasks with minimal changes in job duties and job setting.  And the hypothetical individual is able to occasionally interact with the general public, supervisors, and co-workers.

(Tr. 80)  The vocational expert stated that such an individual could not perform Plaintiff's past work, but could perform other jobs such as sorter, "inspector hand packer," and "bench assembly." (Tr. 81)  However, if the hypothetical individual were off task more than ten percent of the workday, she would not be able to maintain employment.  (Tr. 81-82)

In regard to Plaintiff's medical records, the Court adopts the facts that Plaintiff set forth in her statement of material facts, which the Commissioner admits.  [ECF No. 23-1, 26-1]  The Court also adopts the facts contained in the Commissioner's statement of additional facts because Plaintiff does not dispute them.  [ECF No. 26-2]

   **III.**  **Standards for Determining Disability Under the Social Security Act**

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 416.920(a). Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity. Id. Second, the claimant must establish that she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation omitted). At step three, the ALJ considers whether the Plaintiff's impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1. Id. at 404.1520(d).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. § 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

5

Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. 20 C.F.R § 416.920(g); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012). If the claimant cannot make an adjustment to other work, then she will be found to be disabled. 20 C.F.R. § 404.1520(g).

### IV.     ALJ's Decision

Applying the five-step evaluation, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since October 31, 2017; and (2) had the severe impairments of chronic obstructive pulmonary disease/emphysema, hiatal hernia, IBS, gastroesophageal reflex disease, migraine, PTSD, depression, generalized anxiety disorder, and personality disorder. (Tr. 15) Additionally, Plaintiff had the non-severe impairments of hypertension, atrial fibrillation, hidradenitis suppurativa, and narcoleptic seizures. (Tr. 16) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.)

Based on her review of Plaintiff's testimony and medical records, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 26) The ALJ determined that Plaintiff had the RFC to:

> perform light work … except that she can occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. She must avoid exposure to extreme cold, extreme heat, humidity and loud noise (SCO noise level 4 and above). She must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. She must avoid hazards such as unprotected heights and moving mechanical parts.

6

> She is able to complete simple, routine tasks with minimal changes in job duties and setting. She is able to occasionally interact with the general public, supervisors and coworkers.

(Tr. 19)

Based on the vocational expert's testimony, the ALJ concluded that Plaintiff was unable to perform past relevant work but had the RFC to perform other jobs that existed in significant numbers in the national economy, such as sorter, "inspector, hand packer," and "bench assembly." (Tr. 26-28)  The ALJ therefore concluded that Plaintiff was not disabled.  (Tr. 28)

### V. Discussion

Plaintiff claims that substantial evidence did not support the ALJ's decision because the "ALJ failed to provide a full and fair hearing by stopping the testimony and proceeding ahead to the [vocational expert] testimony without reason or justification." [ECF No. 23 at 5]  Plaintiff further complains that the "total length of the hearing was under 45 minutes" and the ALJ "cut off" Plaintiff's testimony without asking or her counsel whether there was additional testimony to be placed on the record.  [Id.]  The Commissioner counters that Plaintiff received "a fair hearing and full administrative consideration in accordance with applicable statutes and regulations."  [ECF No. 26 at 7]

A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).  A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence

7

support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B.  Full and Fair Hearing

Plaintiff's sole claim on appeal is that the ALJ denied her a full and fair hearing. "A disability claimant is entitled to a 'full and fair hearing' under the Social Security Act." Halverson v. Astrue, 600 F.3d 922, 923 (8th Cir. 2010) (quoting Hepp v. Astrue, 511 F.3d 798, 804 (8th Cir. 2010)). Because the disability determination process is not an adversarial process, the ALJ has a duty to develop the record, even when a claimant is represented by counsel. Noerper v. Saul, 964 F.3d 738, 747 (8th Cir. 2020). However, "reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Wilson v. Kijakazi, No. 1:20-CV-226 SRC, 2022 WL 796243, at *3 (E.D. Mo. Mar. 16, 2022) (quoting Haley v. Massanari, 258 F.3d 742, 750 (8th Cir. 2001)). See also Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993) ("[O]ur inquiry is whether [the plaintiff] was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, we will not remand.").

Here, the ALJ commenced the proceeding at 9:06 a.m. by asking Plaintiff's counsel whether the record was complete. (Tr. 56) Plaintiff's counsel informed the ALJ that Plaintiff

8

underwent an endoscopy the previous week, and the ALJ allowed Plaintiff's counsel three weeks to submit the most recent medical records. (Tr. 58-60) Plaintiff's counsel then announced she would be relying on Dr. Ulrich's medical source statement and made a brief opening statement. (Tr. 61)

The ALJ questioned Plaintiff about her educational and employment background, and Plaintiff stated that she had not worked since 2010. She appeared to attribute her inability to work to a rape she suffered, as well as her IBS. Plaintiff stated that the IBS began causing her "problems" in 2002. (Tr. 63-64) After discussing the treatment records relating to Plaintiff's gastrointestinal impairments, the ALJ asked her whether "any other problems … are keeping you from working?," and Plaintiff described "severe anxiety and depression," PTSD, and pseudo-seizures. (Tr. 67) When the ALJ asked whether Plaintiff had any other "problems" that prevented her from working," she informed the ALJ about her lower-back pain and scoliosis, "bad knees," history of abuse, flashbacks, and difficulty sleeping. (Tr. 69) Finally, the ALJ inquired about Plaintiff's mental health treatment, and Plaintiff explained that she saw psychiatrist Dr. Ulrich, and, before moving to Missouri two years earlier, she received therapy in Alabama. (Tr. 70-71)

Plaintiff's counsel also examined Plaintiff at the hearing. Plaintiff's counsel asked Plaintiff about the "triggers" for her flashbacks and anxiety, and Plaintiff described the frequency and severity of these episodes. Plaintiff also described violence she witnessed and physical and sexual abuse she suffered as a child, as well as more recent sexual assaults by her ex-husband and "a guy" her ex-husband hired to perform yardwork. (Tr. 72) Plaintiff explained that, as a result of these experiences, she did not like "hollering," "fussing," or being "around a bunch of people." (Tr. 72-73) When Plaintiff's counsel observed that Plaintiff was tearful at the hearing, Plaintiff explained that she "often" experienced crying spells. (Tr. 73)

9

Plaintiff's counsel inquired about Plaintiff's ability to concentrate, and she explained that she had difficult reading, conversing, and watching movies.  (Tr. 73-74)  In response to questions about mental health medications, Plaintiff stated that, after Dr. Ulrich prescribed one that "put bad thoughts in my head," he discontinued that drug and prescribed Cymbalta, "Buspar for my anxiety," "Klonopin[] for my anxiety and my panic attacks," and a "medication that helps blocks nightmares so that I can get a decent night sleep…."  (Tr. 74-75)  Plaintiff stated that she suffered one- to two-hour panic attacks two or three times per day, during which she cried and retreated to her bedroom.  (Tr. 75)

Plaintiff's counsel also questioned Plaintiff about her physical impairments.  Plaintiff explained that, as a result of her acid reflux and IBS, "I go to the bathroom more than anybody else.  I can go to the bathroom about eight times a day and … I have no control of it."  (Tr. 77)  Plaintiff estimated that she had "accidents" requiring a change of clothes four to five times per week.  (Id.)  Finally, Plaintiff testified that she had a "poor appetite because I hurt because the hernia is right here and I've got the bulge.  And my digestive system, it's not digesting my food."  (Tr. 76-77)  Plaintiff stated that, at times, her weight increased and stomach swelled, so that she looked "like I'm eight months pregnant."  (Tr. 77)

At this point in the hearing, the ALJ announced that she needed to call the vocational expert, and Plaintiff's counsel responded, "That's fine."  (Id.)  After the vocational expert testified, the ALJ reminded Plaintiff and Plaintiff's counsel that she would "put the case into post for about three weeks for those records to come in about your IBS" and would then issue a decision.  The ALJ concluded the hearing at 9:43 a.m.  (Tr. 83)

Significantly, Plaintiff does not assert that any evidence or testimony is missing from the record.  Plaintiff fails to identify any information she would have provided had the ALJ allowed

10

her more time to testify.  Nor does she claim that the ALJ's alleged failure to develop the record or allow her more time to testify prejudiced her case.  See, e.g., Onstad, 999 F.3d at 1234 (reversal due to failure to develop the record is only warranted when a claimant is prejudiced by that failure); Orr v. Saul, No. C18-4097-LTS, 2020 WL 1430038, at *3 (N.D. Iowa Mar. 24, 2020) (rejecting the plaintiff's claim that the ALJ failed to develop the record at the hearing where the plaintiff did "not argue she was prejudiced by how the ALJ developed the record").

In this case, the ALJ asked Plaintiff questions related to her education, work history, impairments, and medications.  The ALJ also allowed Plaintiff's counsel to examine her, and both the ALJ and Plaintiff's counsel questioned the vocational expert.  Plaintiff does not assert that any evidence is missing from the record, proffer any questions the ALJ should have asked or testimony the ALJ should have solicited, or assert that she was precluded from testifying about any issues at the hearing.  See id. at *5; Onstad, 999 F.3d at 1234.  Therefore, Plaintiff does not allege, much less demonstrate, that she was prejudiced by the length of the administrative hearing.

Plaintiff suggests that the ALJ denied her a full and fair hearing because her hearing was less than forty-five minutes.  "Although [the] length of a hearing is not dispositive" in determining whether the ALJ fully and fairly developed the record, "it is a consideration."  Battles v. Shalala, 36 F.3d 43, 45 (8th Cir. 1994) (ALJ did not sufficiently develop the record when the hearing was ten minutes, the ALJ asked no questions, and the claimant's counsel asked no questions related to claimant's capacity to work).  Plaintiff does not cite any legal authority supporting her position that, to be full and fair, administrative hearings require a specific length of time.  Indeed, courts have found that hearings the same length as or shorter than Plaintiff's were full and fair.  See Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013) (substantial evidence supported the ALJ's determination where the administrative hearing was thirteen minutes long); Chase D. C v.

11

Kijakazi, No. 20-CV-1292 ADM/TNL, 2022 WL 479357, at *6–8 (D. Minn. Jan. 31, 2022) (thirty-eight-minute hearing did not deny the plaintiff a full and fair hearing); Orr v. Saul, 2020 WL 1430038, at *3 (plaintiff received a full and fair hearing where the hearing transcript contained only eight pages of her testimony).  After a review of the record, the Court finds that Plaintiff failed to demonstrate that she did not receive a full and fair hearing.

An ALJ does not fail in her duty to develop the record if substantial evidence exists to allow her to make an informed decision.  Haley, 258 F.3d at 749; Chase D.C., 2022 WL 479357, at *7.  Here, the ALJ thoroughly reviewed Plaintiff's testimony, function report, and medical records, which included Dr. Ulrich's opinion, as well as an internal medicine consultative examination, a consultative psychological examination, and a physical RFC assessment.  The ALJ also explained how the objective findings contained in Plaintiff's treatment notes and consultative examinations supported the RFC determination.  "Where 'the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations,' the claimant has received a 'full and fair hearing.'"  Jones v. Astrue, 619 F.3d 963, 969 (8th Cir. 2010) (quoting Halverson, 600 F.3d at 933).  Furthermore, "as long as substantial evidence in the record supports the Commissioner's decision, [the Court] may not reverse it because substantial evidence [also] exists in the record that would have supported a contrary outcome, or because [the Court] would have decided the case differently."  Andrews v. Colvin, 791 F.3d 923, 928 (8th Cir. 2015) (quotation marks and citation omitted).

## VI.    Conclusion

For the foregoing reasons, the Court finds that the ALJ based her determination on the evidence in the record, including medical records, observations of treating physicians, consultative

examinations, and Plaintiff's own descriptions of her limitations, as set forth in her function report and hearing testimony.  The Court therefore concludes that the ALJ fulfilled her duty to develop the record and her decision is supported by substantial evidence on the record as a whole.  Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of August, 2022